UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TOSUN MAHMUD FITIL, | ) | Case No. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF OMAHA, OMAHA POLICE CHIEF TODD SCHMADERER, and OFFICERS JANE OR JOHN DOES, 1-21, in their individual capacities as employees of the City of Omaha. | ) ) ) ) ) ) | **COMPLAINT** |
| Defendants. | ) | |

Plaintiff Tosun Mahmud Fitil for his Complaint against Defendants City of Omaha, Omaha Police Chief Todd Schmaderer, and Jane or John Does, 1-21, states and alleges as follows:

**INTRODUCTION**

1. Plaintiff Tosun Mahmud Fitil is a forty-one-year-old resident of Omaha, Nebraska. Inspired by calls for racial justice and police accountability following the death of George Floyd, Mr. Fitil participated in a peaceful protest in midtown Omaha on May 29, 2020.

2. On the evening of May 29, 2020, Mr. Fitil and hundreds of other peaceful protestors gathered at the area of 72nd and Dodge Street, holding signs and calling for reform. The protestors were met by dozens of law enforcement officers in riot gear. Around approximately 10:00 pm, one of the officers launched a flash bang grenade at Mr. Fitil, directed at his head and face. The grenade forcefully struck Mr. Fitil and then exploded after striking his head.

3. Mr. Fitil sustained serious and permanent injuries.

4. The Defendants' response to Mr. Fitil's peaceful demonstration violated the U.S. and Nebraska Constitutions, and Mr. Fitil has suffered serious and permanent injuries as a result.

1

# PARTIES

5. Plaintiff Tosun Mahmud Fitil is a forty-one-year-old resident of Omaha, Douglas County, Nebraska.

6. Defendant City of Omaha is a municipality incorporated in the State of Nebraska which was and is responsible under law for the acts and omissions of its law enforcement officers, agents, and other employees, including those whose conduct is at issue in this lawsuit.

7. Defendant Todd Schmaderer was, at all times relevant to this action, the chief policymaker for the Omaha Police Department. He is sued in his individual and official capacities.

8. Defendant Officers Jane and John Does 1–21 are employees with or agents of the City of Omaha who responded to protests on behalf of the City of Omaha on May 29 through June 5, 2020. The precise number and identity of these Defendants is presently unknown to Plaintiff. At all times relevant herein, each of these Defendants were acting under color of state law and in the scope of their employment.

# JURISDICTION AND VENUE

9. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it involves a federal question under 42 U.S.C. § 1983.

10. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this judicial district and it is where a substantial part of the events giving rise to the claims occurred.

# FACTUAL ALLEGATIONS

### A. George Floyd, Zachary Bear Heels, and the May 29, 2020, Omaha Protest

11. On May 25, 2020, George Floyd, a Black man, was killed in Minneapolis, Minnesota by the police. Mr. Floyd was accused of a non-violent offense. During his arrest, Mr. Floyd fell to the ground, and was handcuffed and restrained. Minutes later, for no discernible reason, Minneapolis Police Officer

Derek Chauvin placed his knee—and the weight of his body—on Mr. Floyd's neck as Mr. Floyd lay pinned to the ground.

12. For almost nine minutes, Officer Chauvin pressed his knee into Mr. Floyd's neck as Mr. Floyd struggled to breathe, pleading for mercy. Instead of intervening, other officers held Mr. Floyd's legs or stood by, watching as Mr. Floyd began to die. Among Mr. Floyd's last words were, "Please, please, please, I can't breathe."

13. Mr. Floyd's death was captured on video and broadcast globally, sparking demonstrations in over 2,000 cities across the country and around the world.

14. Groups of demonstrators throughout the country, including in Omaha, Nebraska, began gathering on a daily and nightly basis to protest the systemic injustices perpetuated against Black, Indigenous, and other people of color.

15. With limited exceptions, the daily Omaha protests ("the Protests") were overwhelmingly peaceful. Based on the alleged conduct of a few protesters, however, Defendants responded by indiscriminately using excessive force and aggressive dispersal tactics against protestors.

16. On June 06, 2017, Zachary Bear Heels, a Sičangu Lakota and Kiowa Apache man, was killed in Omaha, Nebraska by the police while suffering a mental health episode. Omaha Police officers encountered Mr. Bear Heels at 60th and Center Streets, after he had been wandering Omaha in the grips of a schizophrenic episode and suffering from excessive heat and dehydration. After dragging him across the parking lot by his braids, the officers tased a completely disoriented Mr. Bear Heels over 12 times and punched him repeatedly while attempting to arrest him.

17. After restraining him in zip ties, two officers were observed from footage placing their full weight on Mr. Bear Heels' back. When officers turned him over, Mr. Bear Heels was dead.

18. Mr. Bear Heels' wrongful death has been commemorated through an annual Native American Prayer Walk in Omaha, Nebraska since 2017, in part to protest the excessive and unreasonable use of force by Omaha Police that killed him. Mr. Fitil has organized and participated in the prayer walk every year since 2017.

19. Prior to the May 29th, 2020 Protests, Omaha Police Chief Todd Schmaderer publicly criticized the Minneapolis Police Department's conduct while defending the Omaha Police Department. Mr. Fitil attended the May 29th, 2020 Protest in part to raise awareness of the similar nature of the brutality by police in causing the deaths of both George Floyd and Zachary Bear Heels.

20. The Defendants' response to the Protests included the use of "less-lethal" weapons, including, but not limited to, tear gas and other chemical irritants, flash-bang grenades, bean bags, rubber bullets, Kinetic Impact Projectiles ("KIPs"), and eXact iMpact Sponge Rounds.

21. Defendants deployed chemical irritants both by targeting specific protestors and by launching canisters into a crowd, releasing the irritants indiscriminately in every direction.

22. Defendants also deployed flash-bang grenades at protestors. When these weapons detonate, they generate loud noise and bright light. Defendants used this weaponry without any training or instruction as to its use as an alleged "crowd control" mechanism.

23. In addition, Defendants shot bean bags, rubber bullets, KIPs, and eXact iMpact Sponge Rounds at protestors.

24. Tear gas can be lethal. Tear gas exposure can severely impact those with asthma and can trigger a fatal asthma attack. Even when not directly lethal, exposure to tear gas can increase the risk of developing acute respiratory illnesses.

25. Pepper balls can be lethal. Pepper balls are plastic balls fired at high velocity from an air-propelled gun. Pepper balls explode on impact, releasing an intense chemical irritant into the air.

26. Flash-bang grenades can be lethal. Flash-bang grenades are military-style explosives intended to stun and disorient people with light and loud sound, and are designed to temporarily blind or deafen people. The use of these weapons can cause serious injuries, like blowing off appendages, or even death. They can also damage eardrums, cause prolonged ear pain, harm the retina, and lead to burns, concussions, and psychological trauma. They are particularly dangerous if they detonate close to a person.

### B. Tosun Mahmud Fitil

27. At all relevant times, Plaintiff Tosun Mahmud Fitil was a thirty-eight-year-old resident of Omaha, Nebraska.

28. Mr. Fitil participated in the Protests on May 29, 2020, to protest the killing of Zachary Bear Heels and George Floyd.

29. Mr. Fitil carried a sign condemning the death of Zachary Bear Heels, who was killed by Omaha Police Department officers in 2017.

30. Mr. Fitil gathered with other protestors to peacefully demonstrate near 72nd and Dodge Street.

31. Although the demonstration was non-violent, law enforcement officers arrived dressed in riot gear and armed with weapons.

32. At approximately 10:00 p.m., without any audible warnings, officers marched toward the protestors. They began deploying pepper balls, flash-bang grenades, and tear-gas canisters indiscriminately into the peaceful crowd.

33. Protestors attempted to leave the scene, but their movement was restricted as the Defendant Officers and their vehicles blocked points of entry and exit. Chemical irritants, including gas canisters and pepper balls, exploded directly in front of Mr. Fitil and other protestors, impairing their vision and further restricting mobility.

34. As Mr. Fitil stood on the sidewalk peacefully holding his sign, he witnessed officers shooting pepper balls indiscriminately at a group of young people standing nearby, who were also peacefully protesting.

35. Mr. Fitil stepped towards the young protestors, attempting to place himself between them and the officers out of concern for their safety. He implored the officers to stop harming the peaceful protestors

36. Mr. Fitil witnessed a John Doe Officer look at him, aim a weapon directly at him, and fire a projectile toward Mr. Fitil's head from close range.

37. At the moment John Doe Officer aimed and shot him, Mr. Fitil's sign condemning the Omaha Police Department's killing of Zachary Bear Heels was plainly visible to the officer.

38. On information and belief, this projectile was a flash-bang grenade or a similar concussive or explosive agent.

39. The flash-bang grenade slammed into the back of Mr. Fitil's head with incredible force, causing a laceration.

40. The explosion was deafeningly loud and ruptured Mr. Fitil's eardrum. An incendiary agent released in the explosion burned Mr. Fitil's skin and singed holes in his clothing.

41. Shocked and disoriented, Mr. Fitil tried to move away. As he attempted to retreat, there was a second explosion near his left side.

42. Mr. Fitil collapsed and lost consciousness. When he regained consciousness, he was incapacitated. His shirt was on fire. Other protestors assisted him by pouring water on him.

43. Mr. Fitil once again attempted to retreat, this time towards the parking lot, injured, disoriented, and stumbling. The John Doe Officers continued to block his retreat, shouting for him to "move back" while advancing.

44. At no point prior to shooting him with the grenade, did the John Doe Officer warn Mr. Fitil that he would be shot or provide an opportunity for Mr. Fitil to retreat or comply.

45. At no time prior to being shot did Mr. Fitil's actions give any indication that he was committing a crime or posed any threat to the public safety or law enforcement.

46. The flash-bang grenade launched by the John Doe Officer caused Mr. Fitil serious and permanent injuries, including permanent hearing loss; tinnitus; a traumatic brain injury and severe concussion resulting in persistent and disabling headaches and migraines, balance and mobility issues, and post-traumatic stress disorder. These injuries resulted in the need for vestibular rehabilitation, the use of a cane, sensitivity to light and sound, loss of sensation in his legs, "drop foot," and impaired concentration.

47. Based on the scene as it would have appeared to the Defendant Officer(s) at the time the flash-bang grenade was launched at Mr. Fitil, there was no reasonable basis for launching the grenade at or near him or any other individuals gathered on the sidewalk.

### C. Municipal and Joint Liability.

48. Omaha Police Chief Todd Schmaderer has a sufficiently senior role such that his decisions may fairly be said to represent official policy of the City of Omaha.

49. Upon information and belief, Chief Schmaderer and other key policymakers (collectively, "Officials") met, discussed, and approved the use of weaponry, including flash-bang grenades, chemical irritants, KIPs, rubber bullets, and eXact iMpact Sponge Rounds, in advance of the May 29, 2020 demonstrations in Omaha, Nebraska.

50. All of the foregoing Defendants, including the individual officers present, agreed with and assisted each other to approach the group of peaceful protesters; to use flash-bang grenades and other means of "less-lethal" force for the purpose of dispersing the protesters; lent their support and the authority of their office to each other; failed to intervene to prevent the indiscriminate, excessive and unlawful use of flash-bang grenades and other "less-lethal" weapons; and advised, assisted, ratified and/or directed the actions and inactions resulting in the severe injuries suffered by Mr. Fitil.

51. The extent of cooperation by and between law enforcement agencies and Defendant Officers is reflected in the Omaha Civil Unrest Report created by Chief Schmaderer in October 2020. The report indicates that "officers from different precincts or even neighboring agencies were mixed together" and that "support from outside agencies was imperative to the success of the overall mission."

52. In the months following the protests, and the severe injuries suffered by Mr. Fitil, Officials ratified the use of flash-bang grenades and other "less-lethal" weapons against the crowds. For his part, Chief Schmaderer stated that OPD officers "carried themselves, as a whole, really professionally" and that he was "proud of [OPD's] patience." He publicly declared that in a review of officers' conduct during the protests, OPD found <u>only three</u> instances of excessive use of force out of 123 documented instances.

53. Additionally, the Officials received notice during the May 29, 2020 protests that officers were indiscriminately using "less-lethal" force against protestors to control and suppress demonstrations in the absence of any imminent

threat to safety, including through widely publicized photos and videos, citizen complaints, and firsthand accounts circulated through the press and social media.

54. Despite receiving notice, the Officials failed to take swift action sufficient to remedy the ongoing violations of protestors' constitutional rights by officers, including by failing to train, supervise, or discipline officers or issue corrective policies to prevent further violations.

55. Instead, the Officials continued to authorize the use of "less-lethal" force to control demonstrations even while acknowledging that the majority of protestors had been peaceful.

56. The Officials also acted with deliberate indifference in equipping their officers with chemical munitions and "less-lethal" weaponry, including flash-bang grenades, without proper training and instruction. In his Omaha Civil Unrest Report, Chief Schmaderer acknowledged that training for large protest events is "typically minimal." In particular, he noted a lack of training related to use of force in "a crowd management/civil disorder situation."

57. Because OPD officers received minimal training in crowd control methods, including the use of "less-lethal" weapons, Chief Schmaderer admitted the protests themselves served as a training of sorts, where "officers gained valuable experience that was reflected in improvements that were made" each day. The unconstitutional consequences of equipping officers with supposed "crowd control" weaponry they do not know how to use are patently obvious.

58. The Officials acted with deliberate indifference to Plaintiff's constitutional rights by authorizing, both explicitly and implicitly, the indiscriminate use of "less-lethal" force against protestors who did not pose any safety threat; by failing to properly train officers on the use of "less-lethal" weaponry, including flash-bang grenades, as a "crowd dispersal" technique; by failing to supervise and discipline officers regarding appropriate use of force against protestors; and by failing to rectify OPD's unconstitutional custom of using "less-lethal" force to control and suppress demonstrations.

## FIRST CAUSE OF ACTION

**Violation of the First Amendment / Retaliation – 42 U.S.C. § 1983**

59. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

60. Defendants' decision to launch a flash-bang grenade at Mr. Fitil violates the First Amendment in at least five ways: (i) as unconstitutional retaliation for expressive conduct protected under the First Amendment; (ii) as a violation of the right to peaceably assemble; (iii) as an unconstitutional restriction to a traditional public forum; (iv) as unconstitutional content and viewpoint-based discrimination; and (v) as a violation of Mr. Fitil's right to record matters of public interest.

61. Defendants have adopted and/or ratified municipal policies, practices, and customs that have caused the violations complained of herein and, in the alternative, have actual or constructive notice of the constitutional violations described herein and have failed to take action, thereby allowing the continuation of such a policy or custom, and causing the harms complained of herein.

62. Mr. Fitil's rights to assemble, protest, and demonstrate peaceably are all protected activities under the First Amendment of the United States Constitution.

63. Defendants, including John Doe Officers 1–21, acted under the color of state law when they deprived Mr. Fitil of his rights to assemble, protest, and demonstrate peaceably by striking him with a flash-bang grenade that subsequently exploded near his head. Defendants' use of force against Mr. Fitil and other similarly situated protestors was substantially motivated by the protesters' and Mr. Fitil's engagement in First Amendment-protected activity, constituted an effort to deter future similar activity, and evidences a pattern or practice of unconstitutional conduct that is certain to continue absent any relief.

64. The above-described conduct was, and continues to be, a proximate cause of Mr. Fitil's pain and suffering and has chilled his desire to participate in future protests.

## SECOND CAUSE OF ACTION

### Violation of the Fourth Amendment – 42 U.S.C. § 1983

65. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

66. Mr. Fitil did not commit a crime, and was not suspected of committing a crime.

67. Mr. Fitil did not pose a threat to Defendants or any of their officers or agents or any other person.

68. Mr. Fitil was seized by Defendants when Defendants' officers intentionally, by kettling and through the use of force and flash-bang grenades, terminated his freedom of movement.

69. Defendants' use of chemical irritants, flash-bang grenades, KIPs, rubber bullets, and eXact iMpact Sponge Rounds to effect the seizure was objectively unreasonable and violated Mr. Fitil's protections against being unlawfully seized and subjected to excessive force.

70. Defendants acted under the color of state law when Defendants committed these acts and, as a result, Defendants' acts were objectively unreasonable and constituted unlawful seizure and excessive force.

71. Mr. Fitil fears further retaliation in the future in violations of the Fourth Amendment if he continues to observe, record, or participate in constitutionally protected activity.

72. As a direct and proximate result of Defendants' unlawful actions, Mr. Fitil endured pain and suffering.

## THIRD CAUSE OF ACTION

### Civil Conspiracy – 42 U.S.C. § 1983

73. Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs.

74. The municipal policymakers and John Doe Officers, many of whom were from different law enforcement agencies, reached a mutual understanding to take a course of conduct including, but not limited to, the use of flash-bang grenades and other weaponry on protestors exercising their First Amendment rights to Free Speech and Assembly.

75. The municipal policymakers and John Doe Officers reached a mutual understanding to effectuate the kettling, arrest, and detention of protestors exercising their First Amendment rights.

76. After reaching this consensus, municipal policymakers directed officers under their control and supervision to execute the unconstitutional activity described above. The John Doe officers joined the conspiracy when they agreed to participate in said activity.

77. The plan and conspiracy were furthered by overt acts including, but not limited to, the kettling and seizing of Mr. Fitil, and the firing of "less-lethal" weaponry, including flash-bang grenades, at peaceful protestors like Mr. Fitil.

78. Subsequent reports confirm the Defendants' plan and coordination regarding the indiscriminate use of "less-lethal" weaponry on peaceful demonstrators.

79. Defendants acted with discriminatory animus toward the protestors, and against Mr. Fitil, intending to deny the equal protection of the law to Mr. Fitil, those who associated with the Black Lives Matter movement, and those protesting the death of Zachary Bear Heels by Omaha Police Department officers

80. As a direct and proximate cause of the conspiracy between the Defendant Officers and others, Mr. Fitil was subjected to the deprivation of his First and Fourth Amendment rights, and was severely and permanently injured.

81.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests an Order as follows:
1. Special damages for the cost of his medical care in an amount to be proven at trial;
2. Compensatory damages for the violations of his constitutional and statutory rights, all to be determined according to proof;
3. Punitive damages;
4. Attorneys' fees pursuant to 42 U.S.C. § 1988;
5. Costs of suit;
6. Pre- and post-judgment interest; and
7. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Dated this 21st day of October, 2022.

                              Tosun Mahmud Fitil, PLAINTIFF.

BY:   */s/ Brian J. Fahey*
        Brian J. Fahey, #25753
        FRASER STRYKER PC LLO
        500 Energy Plaza
        409 South 17th Street
        Omaha, NE 68102
        (402) 341-6000
        (402) 341-8290- fax
        bfahey@fraserstryker.com

2572085 v15